James Ray RENTON *v.* STATE of Arkansas

CR 80-60
622 S.W. 2d 171

Supreme Court of Arkansas
Opinion delivered October 12, 1981
[Rehearing denied November 9, 1981.]

*Matthew Horan* and *Tom M. Carpenter,* for appellant.

*Steve Clark,* Atty. Gen., by: *Theodore Holder,* Asst. Atty. Gen., for appellee.

STEELE HAYS, Justice. On the morning of December 21, 1975, the body of John Tillman Hussey, a Springdale Police Officer, was found in a wooded area west of Fayetteville. His hands were handcuffed behind his back and he had been shot four times through the head with his service revolver. In January a felony information was filed charging the appellant and Harold Davey Cassell[1] with the crime of capital felony murder of a police officer acting in the line of duty. Ark. Stat. Ann. § 41-4702 (Supp. 1975). Seventeen months later appellant was arrested in Denver, Colorado, using an assumed name. He was tried, convicted and appeals the judgment sentencing him to life without parole, alleging six errors. We affirm the judgment.

## I.

Appellant's former girl friend, Ms. Connie Marie Caves, provided crucial testimony for the prosecution, including several incriminating statements which she said appellant made to her while they were living together. Appellant insists that he and Ms. Caves were husband and wife under the law of Texas, one of 13 states recognizing common law marriages, and that his claim of the marital privilege should have been granted. Because the issue is critical and involves the law of another state, we examine it in detail, looking first to the evidence and then to the applicable law.

Appellant married Susan Frazier Renton in 1972 and heard indirectly that she had divorced him in 1975, around the time he met Ms. Caves, a high school senior in Salisaw, Oklahoma. Immediately after her graduation Ms. Caves and the appellant left Oklahoma. They first travelled to Arkan-

---

[1]See *Cassell v. State,* 273 Ark. 59, 616 S.W. 2d 485 (1981).

sas and then to Texas where a simulated wedding ceremony was performed on June 8, 1975. The implication of Ms. Caves' testimony is that appellant had promised to marry her and the ceremony was an appeasement which she characterized as a "farce" — the witnesses and the appellant using aliases and treating the matter as a joke. What the legal significance may have been is essentially moot, however, because appellant and Susan Frazier Renton were not divorced until April 28, 1976, almost a year later.

There are a number of aspects of this relationship which are seldom, if ever, present in common law marriages: The traditional use of surname is lacking as appellant appears to have used aliases entirely, even in the putative ceremony; one party to the relationship, appellant, claims their relationship was a marriage, whereas Ms. Caves did not consider it a marriage; the parties would at times register at motels as man and wife, usually as Mr. and Mrs. Jimmie Lee Ford, but at other times they would not; they held themselves out as man and wife at times and at other times they disclaimed any marital relationship, notably while living in Oklahoma City from October, 1976, to early 1977, during which appellant posed as Gene Harold Chapman and Ms. Caves as Kathy Taylor, identified to their acquaintances as the sister of appellant's deceased girl friend; at one point appellant told Ms. Caves to tear up the "marriage license;" the relationship, according to Ms. Caves, was tainted by appellant's urging her to engage in prostitution, to share him and his bed with a Rita Shapp and to have sexual relations with his friend Cassell, all of which she refused; rather than continuing until the death of one, the relationship ended abruptly in January of 1977 when appellant left Ms. Caves and was arrested a year and a half later in Denver, during which she gained the impression that he had taken another girl friend; after his arrest, appellant denied any marital tie to Ms. Caves, answering more than once under oath that he ws separated from Susan Frazier Renton and on one occasion naming Rita Shapp as his wife. He insists this was done to protect Ms. Caves, and perhaps so, but his disavowal is a relevant fact in determining whether he and Ms. Caves regarded themselves as husband and wife. His denial, coupled with the other unusual aspects, is incon-

gruent with the good faith requirement of common law marriages. *Bickford* v. *Carden*, 215 Ark. 560, 221 S.W. 2d 421 (1949).

Appellant relies on the law of Texas, but when that body of law is examined in the light of the evidence the claim cannot be sustained. The Texas statutory definition of informal marriages is found in Texas Family Code Ann. § 1.91 (Vernon 1975), providing that such marriages may be proved by evidence that the parties agreed to be married and after the agreement lived in Texas as husband and wife, representing to others that they were married.

There is an abundance of case law that claims of common law marriages should receive "close scrutiny" by the courts. *Bodde* v. *State*, 568 S.W. 2d 344 (Tex. Cr. App. 1978); *Chatman* v. *State*, 513 S.W. 2d 854 (Tex. Cr. App. 1974). It is said that the agreement of marriage must be specific on both sides. *Archie* v. *State*, 511 S.W. 2d 942 (Tex. Cr. App. 1974). In the case of *Welch* v. *State*, 151 Tex. Cr. R. 356, 207 S.W. 2d 627 (1948), it is said that *stability* and *permanence* are "vital" to common law marriages.

In *McChesney* v. *Johnson*, 79 S.W. 2d 658 (Tex. Civ. App. 1934), it was said that *consistency* was an essential requirement of common law marriages, and

> [i]f the conduct of such contracting parties does not show clearly an honorable abiding by such agreement before the eyes of their world of associates and contacts, *then it should not receive judicial sanction.* (Emphasis added.)

Two early Arkansas decisions examining Texas common law marriages are *Evatt* v. *Miller*, 114 Ark. 84 (1914), and *Darling* v. *Dent*, 82 Ark. 76 (1907). Dicta from both opinions cite the requirement that the parties must agree presently to take each other as husband and wife and live *"from that time on* professedly in that relation." (Emphasis added.)

Appellant has still another hurdle: At the time the

alleged common law marriage began he was still married to Susan Frazier Renton and continued to be until April 28, 1976. He contends that no new agreement is necessary to validate the marriage after the impediment is removed, relying on *Gorman* v. *Gorman,* 166 S.W. 123 (1914) and *Bull* v. *Bull,* 29 Tex. Civ. App. 364, 68 S.W. 727 (1902). Both cases are distinguishable: In *Gorman* the couple continuously lived together as man and wife until the death of one, never knowing of any impediment to their marriage. In *Bull,* in contrast to the case before us, there was no evidence that the couple separated or resumed single status, or did anything inconsistent with a marriage status for 13 years until the death of one, four years after the impediment was removed.

We can find no evidence appellant and Ms. Caves ever cohabited in Texas after appellant's divorce, nor any evidence from which a new agreement to be man and wife can be inferred. They did cohabit briefly in Seattle, Washington, after appellant's divorce, but common law marriages are not recognized in that state. *In re McLaughlin's Estate,* 30 Pacific 651. *Clark on Domestic Relations,* 2d Ed., Sec. 3, p. 67.

If more were necessary, we note that on more than one occasion after his arrest appellant was asked if he was married and answered "no." It would be a gross distortion to say that a relationship as dubious as this one, clearly lacking in the essentials of stability, consistency and permanency, could rise to the level of marriage, either before or after the divorce, and we readily conclude that the trial court was correct in refusing to invoke the marital privilege. The purpose behind the marital privilege is to promote the permanency and solidarity of the marital union; to cloak this relationship with the protective sanctions of marriage would serve only an unworthy end.

## II.

Appellant argues that the State failed to prove that Officer Hussey was acting in the line of duty as required by the Capital Murder Statute, Ark. Stat. Ann. § 41-1501 (1) (b) (Repl. 1977), citing *Mullaney* v. *Wilbur,* 421 U.S. 684 (1975),

for the proposition that the State must prove every element of the charge and aggravating circumstance in enhancement of the degree of culpability, beyond a reasonable doubt. The State's proof was sufficient.

The distinction between a police officer's *duty* and his *authority* to make a lawful arrest is essential. Officer Hussey was not stripped of his capacity to act as a policeman in the line of duty merely by leaving the Springdale city limits. Since Officer Hussey could not testify, proof of the lawfulness of the stop of the International Travel-all is not available. Under these circumstances, any conclusion that Officer Hussey was authorized to act as he did pursuant to the Arkansas "fresh pursuit" statute is speculative, but nonessential. An abundance of evidence was presented from which the jury could conclude that Officer Hussey was acting in the line of duty. Hussey had gone on duty at midnight on December 20, 1975, and between the hours of 3 and 4 a.m. was on patrol. At 3:49 a.m. he reported to the Springdale radio dispatcher that he was stopping a vehicle bearing a Texas license plate numbered JEX966 for a traffic violation. Hussey made this report near the southern border of Springdale. Moments later his car was found, door open and lights flashing, about eight tenths of a mile south of the Springdale city limits but with Hussey missing. Officer Hussey was working in an area where he would be expected to be, the incident happened during his regular shift and he was engaged at the time in duties regularly performed and expected. Thus, the elements of time, activity and location, all coincide to support the conclusion that he was acting in the line of duty when the events began which led to his death. In *Meyers* v. *State*, 253 Ark. 38, 484 S.W. 2d 334 (1972), we held a policeman to be acting in the line of duty where he attempted an arrest for a misdemeanor while off-duty and working as a security guard. "He is, in a sense, on duty 24 hours a day, seven days a week. . . . " *Meyers*, at 46. The obvious purpose of this statute is to protect the public generally by affording special protection to those who accept the ever-increasing hazards of police work. There can be no doubt that the circumstances surrounding the death of Officer Hussey were contemplated as coming under the language of this statute.

## III.

Next, appellant alleges a pattern of violations by the State of Rule 17.1, A. R. Crim. P., Ark. Stat. Ann., Vol. 4A, 476, 477 (Repl. 1977) has deprived him of a fair trial. This rule obligates the State upon timely request to disclose the names and addresses of its witnesses and any *statements* attributed to the accused or a co-defendant. *Earl* v. *State*, 272 Ark. 5, 612 S.W. 2d 98 (1981); *Dupree* v. *State*, 271 Ark. 50, 607 S.W. 2d 356 (1980).

Rule 19.7 (1), Arkansas Rules of Criminal Procedure gives the trial court discretion to impose certain sanctions for noncompliance with a discovery order as follows:

> (a)   If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or with an order issued pursuant thereto, *the court may order such party to permit the discovery* or inspection of materials not previously disclosed, *grant a continuance, prohibit the party from introducing in evidence the material not disclosed, or enter such other order as it deems proper under the circumstances.* (Emphasis added.)

Three specific violations are emphasized in appellant's brief:

Appellant contends the State's refusal to reveal the location of Ms. Caves and its delay in affording an opportunity to discovery testimony was prejudicial to his case. The record shows:

> (1)   The court arraigned Renton on August 24, 1978, and set trial for November 27, 1978 [R. 500] later changed to December 4, 1978;

> (2)   Renton filed a Motion For Discovery on August 29, 1978, asking for the names and addresses of witnesses, and the substance of oral statements made by Renton and co-defendants [R. 6-8];

(3) Two weeks later, the State answered Renton's motion on September 11, 1978. The State did not list Connie Caves as a witness. The State said there were no oral statements made either by Renton or co-defendants to law enforcement officers [R. 10-16; Response to Bill of Particulars];

(4) On November 14, 1978, the State revealed that it would call Connie Caves [R. 345] as a witness;

(5) On November 21, 1978, continuance granted appellant;

(6) On June 23, 1979, appellant afforded opportunity to interview Ms. Caves;

(7) On July 9, 1979, trial began.

Under Rule 19.7 (a), it is within the trial court's discretion to employ any one of the listed sanctions or one of its own choosing where there is a failure to comply with discovery. Upon timely request, the trial court afforded appellant with an opportunity to interview Ms. Caves on June 23, 1979, sixteen days before the trial commenced. Appellee contends any failure to comply with discovery regarding Ms. Caves was properly remedied by the interview as a permissible sanction under Rule 19.7 (a). Rule 17.1 imposes a duty upon the state to disclose all material and information to which a party is entitled in sufficient time to permit his counsel to make beneficial use of it. *Dupree* v. *State, supra; Williamson* v. *State,* 263 Ark. 401, 565 S.W. 2d 415 (1978). Appellant has not shown any prejudice resulting from the delay in being allowed to interview Ms. Caves, nor did he move for continuance after their interview, claiming insufficient time to make beneficial use of the information received.

Appellant contends the circumstances surrounding his interview with Ms. Caves with officers of the FBI present prevented any chance he had of obtaining information helpful to the defense. Rule 17.1 only allows a criminal defendant the *opportunity* to discover the state's testimony

prior to trial. As this court stated in *Dupree* v. *State, supra,* "[A] defendant in a criminal case cannot rely upon discovery as a total substitute for his own investigation." At page 55. Appellant argues no affidavit or other factual showing was made by the State indicating Ms. Caves feared for her safety and necessitating that the interview be under restrictive circumstances. Appellant cites no authority requiring such affidavit in this context. In reviewing the circumstances of this case, the source and reasonableness of Ms. Caves' fears are so obvious that further factual showing is unnecessary. There are special considerations in this case: She was a "critical witness," as characterized by appellant, in a capital murder case involving the execution-style killing of a police officer by a group whose only visible vocation was illicit. We believe fears for her safety were not unjustified and the precautions taken were not excessive.

### B.

Donald Gunnarson testified that he was one of several FBI agents who arrested the appellant in Denver, Colorado. (T. 3880) He said at the time of the arrest the appellant stated "you caught me short" and something to the effect that the agents were fortunate that they weren't hurt. (T. 3881) The prosecuting attorney admitted that by an oversight he had neglected to inform defense counsel of this statement prior to trial. (T. 3834, 3835) The trial court then held a *Denno* hearing out of the presence of the jury (T. 3841-3859) and allowed Gunnarson to testify to the statement. (T. 3881)

This action is claimed to require reversal. At first blush this evidence bears a strong resemblance to *Earl* v. *State, supra,* in which a nondisclosed statement of Earl affirming other inculpatory statements attributed to him was introduced to the surprise of the defendant. The prejudice was clear as Earl had denied the statements earlier on direct examination. Hence, his credibility as a witness was destroyed. In addition, a hearing on the voluntariness and admissibility of the undisclosed statement was not held.

Agent Gunnarson and the appellant gave different versions of appellant's words: Gunnarson alleging appel-

lant said "It is lucky you caught me short. Somebody should have been hurt." [R. 3823) Appellant alleges he said "I am glad nobody got hurt." At best, these versions are indistinct and susceptible of similar inferences; at worst they are equivocal and we consider the harm insufficient to overturn the judgment. They are, after all, essentially of the same effect as those Ms. Caves attributed to the appellant in her testimony. It was in the trial court's discretion to suppress Gunnarson's testimony for nondisclosure, Rule 19.7 (a); *Brenneman and King* v. *State,* 264 Ark. 460, 573 S.W. 2d 47 (1978) — and reversal is not required absent a showing of prejudice. *Earl* v. *State, supra; Dupree* v. *State, supra.* We find the likelihood of prejudice or abuse of discretion insufficient to require reversal.

## C.

Appellant argues the State's failure to provide current addresses for Debra Whisenhunt, Helen Vandandingham, Roger Whisenhunt and Bob Wise is ground for reversal. The record reveals Helen Vandandingham, the defense's key witness, did indeed testify. Roger Whisenhunt was contacted a week before the end of trial by the defense but did not testify. The Whisenhunts divorced and Debra moved out of the state and could not be found by either party. Bob Wise, who had picked out appellant's picture as driving the Travel-all, was never found. The State elicited testimony that he picked the appellant from a photograph. Appellant produced testimony from one witness that Wise's description of appellant during the photo identification was doubtful and more descriptive of Carl Don McLaughlin. The State's case implicates both men, Renton and McLaughlin, as being involved in this criminal episode and thus the description of McLaughlin as the driver of the Travel-all the day *before* the crime could be of no real significance. Consequently, the appellant has not shown the prejudice necessary for reversal.

## IV.

Appellant contends that Exhibit 25 was hearsay and not the best evidence and his objection to its introduction should

have been sustained. The exhibit is a handwritten copy of entries on the Springdale police radio log made by Officer Olin Stepp early on the morning of December 21. The log was later destroyed. We find no merit to the contention. The best evidence rule limits the evidentiary use of secondary evidence where the original itself is not unavailable. But here it is undisputed that the original of the radio log was destroyed, as appellant's objection reflects: "Your Honor, I am going to object on best evidence grounds since the original has been destroyed." [T. 3522] Rule 1004; Uniform Rules of Evidence, Ark. Stat. Ann. § 28-1001 (Repl. 1979), permits the introduction of other evidence of the contents of writings, records or photographs where the original has been lost or destroyed or is in the hands of the opposing side and cannot be obtained. Beyond that, the exhibit simply duplicates *identical* evidence from numerous other sources on undisputed points, i.e. that Officer Hussey stopped a Travel-all near the city limits at 3:49 a.m. and that five minutes later Officer John Dickens reported that he could not find Officer Hussey at the scene. See *Brenneman and King* v. *State, supra.*

## V.

Appellant contends that Ms. Alice Bradshaw, a prospective juror, should have been struck for cause rather than by a peremptory challenge of the defense. During voir dire examination Ms. Bradshaw acknowledged having read a news article of the previous day featuring the trial and referring to appellant as one of the FBI's ten "most wanted" individuals. In the course of the inquiry the trial judge interjected to say that "[b]efore anybody can be arrested there must be what is called probable cause. The prosecuting attorney has to make probable cause, and from that a person is arrested. It does not mean that he is guilty at all. You have to know they do not go out there arbitrarily and arrest somebody. Nobody can be arrested unless there is probable cause."

Whether the comment was inappropriate to voir dire is debatable, but it was, at most, inconsequential and any possible harm was offset by the words "[i]t does not mean

that he is guilty at all." Ms. Bradshaw's responses during the voir dire interview give no indication that she was biased or would judge the case on anything other than the evidence. We find no error in the refusal to excuse Ms. Bradshaw for cause. *Rowe v. State,* 224 Ark. 671, 275 S.W. 2d 887 (1955).

## VI.

The final point for reversal is that because Judge Mahlon Gibson acted to qualify some indeterminate part of the jury panel after the case was assigned to a special judge a reversal is required on jurisdictional grounds. We disagree. There is no evidence whatever that Judge Gibson took any part in these proceedings. There is merely a reference by Judge Cummings at a pretrial conference that some part of the jury panel had been qualified by Judge Gibson pursuant to Ark. Stat. Ann. §§ 39-101 — 39-116, and that others had been excused. These sections of the statutes pertain to general qualifications of jurors and provide specific exemptions from service in the case of physicians, firemen, ministers, practicing attorneys and others. The qualifying process under this chapter of the code is general and perfunctory and does not relate to specific cases in any fashion. Further, counsel for the defendant gave affirmative approval to the proceedings: (T. 1222)

> THE COURT: Now, I have talked to Judge Jameson and he has already qualified his jurors. The term started July the 1st.
>
> MR. HORAN: Right.
>
> THE COURT: New panel, and he has already qualified his jurors, I think yesterday, I believe. I think he had sixty-eight or sixty-nine (68-69) out of a hundred and fifty (150), and Mahlon Gibson will be here Monday to qualify his panel. Their names are already drawn and subpoenaed to be here at 9:00 o'clock, so he will go ahead and impanel his and excuse whoever he has to for cause, sickness. So I will start in on his and then Jameson's will be available Tuesday morning if

we exhaust those in this division. Is there any objection to that?

MR. HORAN: No objection.

Evidently, several members of the panel had been excused by Judge Gibson but were examined by Judge Cummings as to their reasons for asking excusal, but before doing so Judge Cummings asked counsel for both the prosecution and the defense: (T. 1337)

THE COURT: . . . . Any objections to my excusing any of these people?

MR. HORAN: No, your Honor.

MR. SMITH: No, your Honor.

Appellant argues that under *Adams* v. *State*, 269 Ark. 548, 601 S.W. 2d 881 (1980), objections to proceedings of this type are unnecessary. But there is a vast difference between the two situations. In *Adams*, the presiding judge actively participated in a proceeding including accepting guilty pleas to two felony charges where he and the attorney for the State were related within the degree proscribed by Canon 3C (1) (d) (ii) of the Code of Judicial Conduct. We held that under the wording of the Canon the judge should take the initiative in recusing himself, rather than placing that burden on the litigant. Nothing in *Adams* suggests that any jurisdictional flaw occurred in connection with this point.

Finally, this is an immense record — 21 volumes and 4,600 pages. We have studied the objections before the trial court noted by counsel for appellant and appellee and examined the record for other objections not argued on appeal and we find no prejudicial error.

The judgment is affirmed.