Joe HARMON *v.* STATE of Arkansas

CR 82-7                                        641 S.W.2d 21

Supreme Court of Arkansas
Opinion delivered November 1, 1982

*Coy J. Rush, Jr.* and *Herschel W. Cleveland* of *Hixson, Cleveland & Rush,* for appellant.

*Steve Clark,* Atty. Gen., by: *Matthew Wood Fleming,* Asst. Atty. Gen., for appellee.

GEORGE ROSE SMITH, Justice. The appellant, Joe Harmon, was charged with capital felony murder in that he and two younger men, J. D. Phillips, aged 17, and David Michael Turner, aged 22, kidnapped and shot Ricky Bennett on January 23, 1981. After the jury had been sworn the trial

court committed reversible error, albeit reluctantly, by permitting the prosecutor to amend the information to add alternatively that the murder was committed in the course of robbery. The jury found Harmon guilty and condemned him to death. Of the eleven points for reversal we discuss those that may arise at a new trial.

First, the evidence was sufficient to support the jury's verdict, which did not specify either kidnapping or robbery as the underlying felony. Prior to the murder Joe Harmon and Dorothy Rader had been living together in her home at Boles, in Scott county. She testified that she had been trying to get him to move out. The home was also occupied by Ms. Rader's children, by the victim, and by one or two other young persons.

On the night in question Harmon, Phillips, and Turner had been out hunting. They returned after midnight. Harmon, who did not like Ricky, scuffled with him and ordered him to pack his belongings and leave. Harmon, Phillips, and Turner set out to drive Ricky to a bus stop, but instead they took him to a lonely place and shot him three times with a rifle. In Harmon's confession he said he had fired the first shot and each of the younger men then also shot Ricky, who had fallen to the ground.

Harmon made little effort to conceal the crime from Ms. Rader or from her daughter Marie. The next day Harmon was seen burning Ricky's wallet. A few days later he took Dorothy and Marie with him while he buried the body in a shallow grave in the woods. We find substantial evidence to support a verdict finding that Harmon killed Ricky Bennett in the course either of kidnapping or of robbery. Ark. Stat. Ann. §§ 41-1702 and -2103 (Repl. 1977).

At a suppression hearing a week before the trial the court held that Harmon's confession was voluntary and that there had been a valid consent to a warrantless search of Ms. Rader's house, where the officers took possession of the rifle, which belonged to Ms. Rader's son, and of two rings that had belonged to Ricky. Three of the arguments for reversal arise from the pretrial hearing. With respect to the first

argument, we need only say that the trial judge's finding of voluntariness is not clearly erroneous.

Second, the search. Marie Rader, who was sixteen at the time, testified that she and her mother did not report the crime until a month later, because they were afraid of Harmon. On February 23, however, when Harmon had to go to Pine Bluff on a speeding charge, Marie went to the police and reported the murder. She showed the police the grave and also signed a form consenting to the search of her mother's house.

It is argued that Marie could not consent to the search of the house. The question, under Criminal Procedure Rule 11.2, is whether she was a person who, by ownership or otherwise, was "apparently entitled to give or withhold consent." We have said that a person having joint access or control for most purposes may have a sufficient relationship to the premises to give consent. *Grant* v. *State*, 267 Ark. 50, 55, 589 S.W.2d 11 (1979). Also, we have upheld a search when it was "not unreasonable" for the officers to believe that the person in question had sufficient control over the premises to give a valid consent to a search without a warrant. *Spears* v. *State*, 270 Ark. 331, 605 S.W.2d 9 (1980).

We think the trial judge was warranted in finding that Marie, despite her minority, was apparently entitled to give consent. She testified that she knew about consents to searches, having seen her father execute one. She lived in the home and certainly had the right of access and presumably the right to invite visitors to enter. When she accompanied the officers to the house, she had already reported the crime. Her mother was not at home, only her cousin and one other young person being present. She had described the rifle used in the murder and produced it for the officers, without their searching for it. She also took from her finger one of the two rings that had been taken from Ricky. There is no suggestion that any part of the house was the private quarters of Harmon. We discern no invasion of Harmon's rights in connection with the search of the house, owned by Dorothy Rader. In fact, the rifle and rings were surrendered without a search.

A third argument is that the suppression hearing should not have been held in the absence of Harmon, who was being examined at the State Hospital with regard to his mental capacity. At the hearing no one mentioned Harmon's absence until the trial judge brought it up and expressed some concern about it. Even then, Harmon's attorney made no objection and continued to participate in the hearing. When it ended the judge announced his rulings, but said that he would hold the record open in case the defense wanted to introduce additional evidence. At the trial defense counsel said he had nothing more to offer. It is now argued, however, that the hearing should not have been conducted in Harmon's absence.

Even though an accused has a right to be present when any substantive step is taken in his case, we have recognized that the right may be waived by him or by his attorney. For instance, an attorney could waive his client's presence when certain instructions were reread to the jury during their deliberation. *Scruggs* v. *State*, 131 Ark. 320, 198 S.W. 694 (1917). Here, however, Harmon's presence at the suppression hearing was evidently more important than that of the accused in the *Scruggs* case, because the validity of Harmon's own confession was being determined. He should have been present; so upon a new trial the suppression hearing must be conducted again if the State intends to introduce the confession and the items taken at the house, unless Harmon waives his entitlement to have the matters heard anew.

An argument is made that the jury did not represent a fair cross section of the county's population, because no member of the panel expressed such a firm opposition to the death penalty that an excusal became necessary. If by any chance the same thing should happen at a new trial, there would be no error in the absence of a showing of some deliberate exclusion from the panel of persons opposed to the imposition of the death penalty.

We have already mentioned the court's error in allowing a charge of robbery to be added to the information on the first day of the trial. The prosecutor convinced the trial

judge that the amendment was merely for clarity, since capital felony murder had already been charged, with no bill of particulars being requested. The charge, however, was that of murder committed in the course of kidnapping; so the specific charge was in itself a bill of particulars. No excuse was offered for the prosecutor's six-month delay in seeking the amendment. The nature of the charge was unquestionably changed by adding the offense of robbery. That amendment was not permissible in the absence of any notice to Harmon that he was to be required to defend an essentially different charge of capital murder. Ark. Stat. Ann. § 43-1024 (Repl. 1977). It is hardly even arguable that a person can fairly be sentenced to death upon a charge that was not made until the morning of trial, leaving no possibility for thorough preparation of a defense upon both the facts and the law.

Joe Harmon and Dorothy Rader lived together for perhaps a year before the homicide. During two months of that time they lived at a motel in Texas, where Harmon was able to support Ms. Rader and her children. The couple, however, did not hold themselves out as husband and wife, other than by living together. Upon similar facts we held that under Texas law there was no common law marriage, so that the woman could testify against the man. *Renton v. State*, 274 Ark. 87, 622 S.W.2d 171 (1981). That case is controlling here upon the same issue.

The court properly refused a proffered instruction submitting voluntary intoxication as an affirmative defense. Such intoxication is no longer a defense except possibly with respect to a crime requiring specific intent. Ark. Stat. Ann. § 41-207; *Varnedare v. State*, 264 Ark. 596, 573 S.W.2d 57 (1978); AMI Criminal, 4005 (1979). No instruction with respect to that particular possibility was requested. We do not imply that one would have been proper on the proof presented.

Finally, Harmon argues two contentions concerning the State's proof of a previous conviction for manslaughter, submitted to the jury during the punishment phase of the trial as an aggravating circumstance. It is first insisted that

the certificate attesting the conviction was inadmissible, because the certificate was signed by the warden of the Arkansas Department of Correction as purported proof of a conviction in Georgia. The objection is well taken and should have been sustained. Pending a retrial the State will have an opportunity to seek admissible proof.

It is also argued that the statute defining aggravating circumstances limits the use of previous convictions to those of felonies involving the use or threat of violence; so a conviction for manslaughter, which may be committed by reckless conduct, § 41-1504 (1) (c), is inadmissible without proof of details. *See Williams* v. *State*, 274 Ark. 9, 621 S.W.2d 686 (1981). The statute, however, also permits the use of convictions for a felony creating a substantial risk of death or serious physical injury to another person. § 41-1303 (3). Manslaughter is undoubtedly such a felony.

Reversed and remanded.