Walter B. MASON *v*. STATE of Arkansas

CR 85-64                                    712 S.W.2d 275

Supreme Court of Arkansas
Opinion delivered June 23, 1986

*Robert S. Blatt*, for appellant.

*Steve Clark*, Att'y Gen., by: *Mary Beth Sudduth*, Asst. Att'y Gen., for appellee.

ROBERT H. DUDLEY, Justice. This case requires us to decide whether appellant's conviction for first degree murder must be reversed because of ineffective assistance of counsel.

On the afternoon of February 7, 1983, appellant shot and severely wounded Thurman Morse. That evening appellant employed Ralph Lowe to represent him. On February 9 appellant was charged by information with battery in the first degree. On February 18 the victim died, and the information was amended to

charge appellant with murder in the first degree. In November 1983, appellant was found guilty, and his sentence was fixed at twenty years. Lowe did not timely perfect the appeal. The trial court subsequently relieved Lowe, sent a letter regarding Lowe's conduct to our Committee on Professional Conduct, and appointed another attorney to represent appellant in his appeal. On March 20, 1985, the Court of Appeals handed down an unpublished opinion affirming the judgment of conviction. Next appellant filed a petition in this Court asking permission to file for post-conviction relief because of ineffective assistance of counsel. We granted permission to file the petition in circuit court for an evidentiary hearing. On June 27, 1985, the trial court held an evidentiary hearing, and on July 29 entered its order denying relief. We reverse and remand for a new trial on the merits.

The analytical approach to be used in determining whether the Sixth Amendment guarantee has been met is set out in *Strickland* v. *Washington*, 466 U.S. 668 (1984). There, a convicted defendant claimed that his counsel's assistance was so defective that it required a reversal of the conviction. The United States Supreme Court held that in order to prevail on such a claim, the defendant was required to show (a) that counsel's performance was deficient and, (b) that the deficient performance prejudiced the defense to such an extent that it deprived the defendant of a fair trial.

(a) The proper standard for judging attorney performance is that of reasonably effective assistance, considering all the circumstances. When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

(b) With regard to the required showing of prejudice, the proper standard requires the defendant to show that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.

In his brief appellant argues that his attorney was deficient in sixteen particulars. We agree that counsel's representation fell below an objective standard of reasonableness in seven of the sixteen areas, but that showing of seven unprofessional errors, standing alone, does not mandate reversal. In addition to a showing of deficient representation, appellant must prove that there is a reasonable probability that the result of the trial would have been different but for counsel's errors. Four of the errors produced no prejudice. Examples are, even though counsel did not timely file the appeal, there was no prejudice to appellant since a belated appeal was allowed and the Court of Appeals decided the issues on appeal; and, while defense counsel erroneously exercised peremptory challenges before the prosecutor passed upon the jurors, the appellant suffered no prejudice because his peremptory challenges were never exhausted.

However, three of the errors did result in prejudice to the appellant. At the post-conviction hearing, the appellant testified that his attorney did not notify him of the trial date and, as a result, he missed the first day of trial. Counsel testified that he waived the appellant's presence during the first day's voir dire as a matter of trial strategy. The trial court found that the attorney's version was factually correct. Because of the trial judge's superior position to view the witnesses, we cannot say that finding is clearly erroneous. However, even if the attorney's version is correct, error and prejudice are present.

We have held that even though an accused has a right to be present when any substantive step is taken, that right may be waived by him or his attorney. However, we have strongly suggested that the accused should be present at all important phases of the trial. *Harmon* v. *State*, 277 Ark. 265, 269, 641 S.W.2d 21 (1982). Here, ten jurors were selected during the first day of the trial. It is hard for us to conceive of any valid trial strategy which would call for the absence of a defendant the first

day of jury selection, but require his presence during the second day. Certainly, no valid reason is apparent in this case. Counsel's explanation was that because of potential bias against appellant he felt it would be best to interview prospective jurors the first day in appellant's absence. No explanation is given for the opposite conclusion the second day.

The appellant testified that he never saw a jury list, and counsel did not testify that he gave appellant a jury list. Thus, appellant was not able to participate in any manner in the selection of jurors taken the first day.

Appellant testified that he lived in the local area and knew some of the jurors, while the attorney was from out of town and did not know any of the jurors. He testified that he was prejudiced by the taking of jurors Betty Brown and Bertha Bearden. He testified that juror Betty Brown had heard various rumors about his case and could have been prejudiced against him and, because he was not present, he could not tell his attorney about her possible prejudice. More importantly, he testified that juror Bertha Bearden had been the victim of a burglary, and in his opinion, was conviction prone. Under the circumstances, he could not communicate this information to counsel before she was selected as a juror. She was ultimately elected foreman of the jury. During voir dire counsel did not ask any questions of the juror about being the victim of a crime. He asked if she was a friend of the Sheriff, and she responded that she knew the Sheriff very well. No questions were asked about other police officers or if she had worked with them on the burglary.

A sample of the voir dire of juror Bearden causes some additional concern about whether counsel correctly understood the presumption of innocence and the burden of proof:

> Q. [By Mr. Lowe] Do you feel the simple fact that a person is charged with a crime means where there is smoke there's fire?
>
> A. You mean, do I think that he is automatically guilty?
>
> Q. Or, that there is something there?
>
> A. Well, I don't assume that Mr. Mason is guilty of anything until it is proved to me that he's guilty *or*

*innocent.*

Q. And, by *proof, clear and convincing* without any question. Is that correct?

(Emphasis added).

Additional error of counsel which showed a reasonably probable prejudice to the appellant is in the area of trial stipulations. On the first day of the trial, during appellant's absence, counsel stipulated to the cause of death and to allow the State Crime Laboratory report into evidence.

At the post-conviction hearing appellant testified that he had serious questions about the cause of death, mentioned these questions to counsel, but counsel ignored his inquiries and stipulated to the cause of death in his absence. The death did not occur for eleven days after the shooting and cross-examination of the medical examiner would have determined if there were any intervening events which caused or contributed to the victim's death. In addition, by stipulating to the laboratory report, counsel lost for appellant the right to cross-examination, which probably would have proved that the shotgun blast fired by appellant did not strike the victim directly, but ricocheted off of an automobile and struck the victim. Such proof would tend to show there was no intent to kill.

Counsel's examination of witnesses was confusing and ineffectual. While it is difficult to determine the amount of prejudice that resulted, we can say that it so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. We can best illustrate this point by quoting from the cross-examination of the State's trace metal expert:

### CROSS EXAMINATION

BY MR. LOWE:

Q. Mr. Cox, I believe you first—one of the first answers you gave to Mr. Mainard's question was of the tests that I performed. I believe I caught that there was one that wasn't requested or something like that. Were all tests that you would normally perform on this—was everything presented to you that you would normally have to perform

and do testing on?

A. I'm sorry. I missed your question.

Q. Well, perhaps I missed your answer and that's probably why I'm confused. Did you have all of the material, I mean, do you have everything in front of you for the microscopes and I think some other machines, which I confess I don't remember the names, the isotopes, etcetera, did you have everything—was there—was everything furnished to you to run the test? Was there anything else that you could have or should have to run a test to check for gun powder residue or for a victim in a shooting?

A. As far as our laboratory is concerned or as far as the investigating agency?

Q. Either or both. Is there more that could have been done?

A. I'm still—I still don't understand your question?

Q. Well, perhaps—perhaps I don't—perhaps I don't understand your last answer when you're saying, you know, investigators or medical—uh—is there more that could have been done in any event, regardless of who, how, or what?

A. To determine—

Q. Yes.

A. —if gun powder residue was present on a particular object?

Q. Yes, sir.

A. No, sir. The particular test that we use for gun powder residue is the most modern detection technique used in the nation right now.

We have examined this case with a strong presumption that an attorney's conduct falls within the wide range of reasonably effective assistance because there are countless ways to provide effective assistance in any given case. As pointed out in *Strickland* v. *Washington, supra,* at 689:

Judicial scrutiny of counsel's performance must be

highly differential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. *Engle* v. *Isaac*, 456 U.S. 107, 133-134 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

. . .

The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.

█ Even though we have indulged a strong presumption in favor of counsel's conduct, we have concluded that counsel's assistance was not effective and the original trial cannot be relied on as having produced a just result. Accordingly, we reverse and remand for a new trial on the merits.

HICKMAN and HAYS, JJ., dissent.

STEELE HAYS, Justice, dissenting. I believe this case should be affirmed. The trial judge obviously gave serious attention to these allegations of ineffective assistance. His written findings and conclusions dealt with the issues point by point and carefully noted the evidence pro and con. He explained his reasons for each finding in detail. It was he who presided over the trial and who heard the testimony at the Rule 37 hearing. His ability to judge the proof is unquestionably superior to ours and his findings on

these disputed issues are not clearly erroneous. *Thomas* v. *State*, 277 Ark. 74, 639 S.W.2d 353 (1982).

The majority opinion has cited the case law on ineffective assistance, which may be summarized by saying that no higher burden exists under the law than setting aside a criminal conviction based on ineffective assistance of counsel, and rightly so. These are serious charges and should not rest on inconsequential grounds. The appellant has compiled a long list of particulars against defense counsel. But the fact is, with one possible exception, the allegations appear more serious on the surface than, on closer inspection, they prove to be. In short, the Rule 37 petition, as well as the proof, produce a great deal of smoke but very little fire. Had it not been for trial counsel's neglect of his duty to appeal so that the trial court had to remove him and appoint other counsel, I doubt the case would have given us much concern. But what happens *after* a trial is, after all, irrelevant to the issue of whether effective assistance has been rendered *during* the trial.

The majority opinion discusses only three of the allegations of ineffective assistance. From a dissenting point of view the others are notable for their lack of substance:

There is the charge that defense counsel was intoxicated and used drugs during the trial. These charges are admittedly groundless and the trial court so found. The sum and substance of the proof was that some of appellant's family members said they smelled alcohol on counsel's breath—once during a lunch break and once an hour *after* the trial had ended. The witnesses acknowledged the absence of any behavior consistent with intoxication and the trial judge commented that he detected nothing of the sort, even in close communication with counsel at bench conferences. The proof wholly failed to support the claim.

Appellant claims counsel advised him to give the police a statement before even talking with him. This charge was denied by the lawyer and the testimony of State Trooper Don Taylor refutes the contention. He said, "Well, I had been called down here to assist in the investigation and when I got to the jail they had—Mr. Mason had been arrested and he had requested an attorney before I interviewed him and sometime later his attorney showed up, and after he talked with his attorney I did take a

statement from him in his attorney's presence."

Much is made of a particularly minor incident. Shortly after a noon recess counsel asked permission to go to the restroom. The trial judge estimated the interruption at two or three minutes and saw it as entirely insignificant. He was right.

There is the incident of the spectator saying, "No, sir" while a witness was being asked if Thurman Morse, the victim, had ever been in prison. The comment was not factually inaccurate, nor was it contradictory to the response given by the witness. The trial judge immediately instructed the spectators against any recurrence and that was the end of it. To argue that it was ineffective assistance not to request a mistrial ignores the many times this court has said mistrials are an extreme and drastic remedy, to be granted only when prejudice is so manifest the trial cannot in justice continue. *Combs* v. *State*, 270 Ark. 496, 606 S.W.2d 61 (1980). In this instance a motion for mistrial would have been a waste of time and perhaps tactically counterproductive.

One allegation is particularly disturbing—the accusation that defense counsel tried to convey to the jury the impression that appellant, his client, was lying on the witness stand. It is a wholesale distortion of the incident and brings no credit to those who make it. It is one thing to charge counsel with ineptness, but quite another thing to accuse him of a perfidious act toward his own client. While appellant was being cross-examined evidently defense counsel was nodding in agreement, at least the prosecutor perceived it that way and said, "Is your attorney nodding agreement?" The record itself makes it clear that appellant's response was a denial of the implication that he was being coached, not an assertion that his lawyer was disagreeing with him:

Q. . . .Do you reasonably—do you believe that the force that you used was that which is—was reasonably necessary under the circumstances to preserve your own life and the life of your loved ones?

A. Yes, I most certainly did.

Q. That is your testimony? Is your attorney nodding agreement?

A.   No, he is not.

Q.   Okay.

MR. LOWE (Defense counsel): Your Honor—well, I'll withdraw my objection. I'm not testifying here.

MR. SANFORD: Well, you have.

THE COURT: Go ahead.

There is the allegation that counsel did not know the correct standard of proof in criminal cases because on voir dire he asked several jurors if they would require clear and convincing proof of guilt. There is no need to quote excerpts from the record, but nothing suggests counsel did not know the law on this basic point, familiar even to laymen. He may have phrased his question simply to impress on the jury the high standard of proof the state must meet in criminal cases.

There is the charge that counsel met with appellant and defense witnesses for only an hour preparing for trial. This is a frequent complaint in Rule 37 cases because no matter how much time the lawyer spends, the client thinks it was not enough. But the fact is it affords very little likelihood of relief under Rule 37 as there is no way to gauge how much time must be spent on a given case. Here, we need look no further than the finding of the trial court that defense counsel met with appellant and the witnesses in excess of four hours and was adequately prepared.

There is the charge that defense counsel would not call character witnesses for the appellant. The trial court found this decision was not prejudicial and in view of the fact the appellant had a criminal record I cannot say that finding was clearly erroneous.

Appellant claims counsel did not tell him when the trial was to be held. But the proof was undisputed that appellant and defense witnesses gathered with defense counsel at appellant's home at what they repeatedly referred to as "The night before the trial." Evidently they were referring to the first day of the trial. Be that as it may, it is improbable the defendant and his witnesses would have gathered at defendant's home if they were not well aware of the trial and the Rule 37 petition itself alleges that counsel told appellant to come to court after the jury was selected.

There is the point that counsel filed a motion for discovery only the day before trial. But there was proof, to the trial court's satisfaction, that the prosecutor applied an open file policy to this case which defense counsel took advantage of and that defense counsel had completed discovery when the motion was filed.

There is the charge that counsel was inept because on four occasions he excused prospective jurors by peremptory challenge without waiting to see whether the prospect was acceptable to the state. Again, without some showing that such minor departures had an adverse effect on the outcome, they do not meet the stringent requirements of establishing ineffective assistance. The trial court rejected this point with the comment that it was evident the prospects would not have been challenged by the state.

There is the charge that counsel did not call individuals to testify to previous violent acts by the victim, particularly Elbert Frazier, who testified at the Rule 37 hearing that the victim was known to be belligerent and prone to get in fights. But counsel testified he had never heard the name Elbert Frazier mentioned and Frazier said appellant's family was not aware of his knowledge because he had never talked to them about it, nor did he know whether appellant's lawyer was aware he was a potential witness.

Three allegations: (1) That counsel stipulated to the introduction of several items of evidence without appellant's knowledge or consent, 2) that counsel did not know how to examine the appellant and tried to introduce his statement to the police instead of having appellant testify firsthand about the events, and 3) counsel did not know the state's purpose in introducing appellant's statement to the police, proving his ineffectiveness) were summarily rejected by the trial court because there was no proof whatever to sustain them.

The lack of merit of appellant's allegations is illustrated by the fact the majority opinion ignores all but three: the absence of the defendant at voir dire, the stipulation as to the cause of death and several questions posed on cross-examination of Steve Cox, the state's trace metal expert.

As to the cross-examination of Cox, the objection seems to be that the questions were poorly phrased. I agree, but I do not agree

that ineffective assistance is proved by a few clumsy questions. Of the brief excerpt quoted in the majority opinion, only two of the questions seem particularly awkward. Perhaps counsel should have thought through his questions more fully, but how can it possibly be said that this clearly affected the outcome of the trial? The trial court observed that Cox's testimony contained nothing beneficial to the state nor harmful to the defense and that should end the matter.

As to the defendant's absence at voir dire, I am as puzzled as the majority and the trial judge over this unorthodox tactic. But while I have never heard of its use in criminal cases, I cannot say it is so plainly without redemption that it provides, per se, the basis for ineffective assistance. Some lawyers advocate the avoidance of overexposing the client to the jury. They believe the jury becomes weary of looking at the individual on whom all the attention of a trial is centered, that his or her presence in the courtroom should be limited as much as possible. Whether that was the motivation here I don't know, but defense counsel testified that he discussed this tactic with appellant prior to trial. The trial court concluded there was no prejudice and I believe he was correct. The two women jurors cited by the majority testified they knew neither the defendant nor the victim and would try the issues fairly on the evidence. There is no showing to the contrary. More importantly, this issue concerns strategy and we have said again and again we will not substitute our own notions of strategy for those of the practitioner in Rule 37 cases. *Knappenberger* v. *State*, 283 Ark. 210, 672 S.W.2d 54 (1984); *Hayes* v. *State*, 280 Ark. 509, 660 S.W.2d 648 (1983). We should adhere to those precedents.

Finally, there is the matter of the stipulation to the cause of death. It is on this issue that I disagree most emphatically with the majority. In the first place there is not a shred of evidence from which to argue that death may have been attributable to some intervening cause. The medical report said simply that the cause of death was homicide, resulting from a .00 buckshot striking the victim in the left eye and entering his brain. Eleven days later he died. Appellant relies entirely on a "rumor" that Thurman Morse was brain-dead and "his family pulled the plug" when he developed pneumonia. But pneumonia frequently accompanies such injuries, and taking the rumor at face value it still does not

provide the slightest basis for an inference that death was attributable to anything other than a lethal head wound. It is pure speculation to suppose that by refusing to stipulate counsel could have uncovered evidence pointing to an intervening cause—a lead .00 buckshot in the brain is cause enough, whether death is instantaneous or prolonged. What bothers me most is for this court to hold, based entirely on speculation, that by stipulating to the cause of death defense counsel was guilty of ineffective assistance. The holding is bound to have a chilling effect on the defense bar, as the obvious message is 'don't stipulate to the cause of death' lest ineffective assistance claims may follow. Thus a sensible and favorable option to the defense is lost. Sensible because it saves time and resources, favorable because there are many times, when the cause of death is clear, that it is better for the defense for the jury not to have to hear the specific details of the victim's death. That there was no doubt about the cause of this victim's death is attested to by the appellant's own words. At trial the first question he was asked on cross-examination was:

> Q. Birch (appellant), there is no question you killed Thurman Morse by your own act with the use of this 12 gauge shotgun, is there?
>
> A. No, there isn't.

Nor is there any basis for the suggestion the buckshot may have ricocheted off another surface. The occupants of the car with Thurman Morse testified the appellant kicked open the door, drew the shotgun to his shoulder, aimed and fired directly at the car. Photographs of the vehicle corroborate this testimony. They show the blast was direct rather than glancing by reflecting a circular pattern of shot on the side of the car where some eight or nine buckshot pierced the metal door cleanly at ninety degree angles.

When any defense counsel's performance is examined under a magnifying glass from the advantage of hindsight it is easy to find fault. The representation in this case may not have been notably skillful, but who can say with certainty? The result favors the contrary. Having found the defendant guilty (a predictable outcome given the proof) the jury could have imposed a sentence of not less than ten nor more than forty years. It chose twenty, closer to the minimum than to the maximum. Even if the defense

was only marginal, it was still above the level contemplated by Rule 37. Our law inveighs against setting aside a conviction except where the representation falls below *any acceptable standard of performance*. That was not the case here.

The appellant took the life of another human being on less than mitigating circumstances. He was tried fairly and a jury of his peers exacted twenty years, which doubtless would prove to be considerably less. He was provided an appeal by a court appointed lawyer and he was given a thorough hearing under Rule 37. In none of these proceedings was his position sustained. Now a majority of this court, on questionable grounds, is holding the entire process must be repeated. I respectfully disagree.

HICKMAN, J., joins in this dissent.